BARTLEY, C. J.
i'iuiubiuus questions, some of which are of grave importance, are raised by tbe assignments of error in this case. Tbey will be noticed in tbe order, as near as may be, in which tbey are presented on tbe record.
Tbe first assignment of error raises the question of tbe right of tbe accused to elect to be tried in tbe district court. Tbe statute, directing tbe mode of trial in criminal cases, (Rev. Stat. 724,) provides, that on tbe arraign *161 ment of a person indicted for a capital offense, and before pleading, he shall be allowed the liberty to elect whether he will be tried in the supreme court of the county or in the court of common pleas. This statute was enacted under the former constitution of the state, and was applicable to the judicial system under that constitution. By the present constitution, the district court was made the successor of the supreme court in each county under the former constitution. But, except as to causes pending, the original jurisdiction of the district court was expressly defined by the constitution, and, as it has been interpreted, limited to four writs, thereby excluding the jurisdiction in the trial of cases the punishment whereof is death, which had been given to the late supreme court. The question whether the district court could take jurisdiction for the trial of such cases, on the election of the accused pursuant to the statutory provision on that subject, was directly made in the case of Parks v. The State, wherein the decision of the eomm'on pleas, denying to the accused the right to elect to he tried in the district court, was, on full consideration, affirmed by this court. S Ohio St. Rep. 101. This unfortunate operation of the present constitution, doubtless the result of oversight, is much to be regretted. While the new constitution enlarged the means of obtaining justice in civil cases — providing two courts, and allowing a trial in each, as a matter of right, in contests for property, it narrowed the chance for impartial justice, in causes in which life is at stake, by allowing a trial in such cases only in the common pleas, and taking away the right of the accused, which had existed, to elect to be tried in the higher tribunal, held by several judges removed from the local excitement and prejudice which too often surround the single judge in the trial of capital cases, in the common pleas. But the constitution having thus, by its operation, taken away that important right in the trial of cases involving man’s highest earthly in *162 terest, the courts have no power to remedy the difficulty by a restoration of the right thus abridged.
The second assignment of error is, that the common pleas erred in overruling the demurrer to the second, third, fourth, and sixth counts of the indictment. These counts, not containing a direct averment of an intention to kill, in the description of the offense, were defective as counts for murder. But inasmuch as a conviction for manslaughter may be sustained on an indictment for murder, if these counts were substantially sufficient to sustain a verdict for manslaughter, the court did not err in overruling the demurrer.
The verdict is substantially a general verdict of guilty of murder in the first degree; and it is conceded that a judgment on such a verdict will not be reversed on account of one or more bad counts, if there be one good count in the indictment. Bailey v. The State, 4 Ohio St. Rep. 440. It is contended, however, that this rule does not prevail where the accused has, before plea, demurred to the bad counts ; in other words, that it is the right of the accused to purge the indictment of all bad counts by demurrer. There would be great force in this argument if the counts demurred to laid the foundation for the troduction of evidence on the trial, which would not have been competent or pertinent to sustain the good counts. But as this could not have been the case under the indictment before us, we are not able to see how the plaintiff in error could have been prejudiced by the ruling of the common pleas in regard to the demurrer. It may be the right of the accused to demur to the defective counts of an indictment, and invoke the judgment of the court upon them. But if, after the demurrer is overruled, the accused pleads to the whole.-indictment, and there is a general verdict of guilty, the good counts will sustain the judgment of the court. This is the general rule, and we see nothing in this case to make it an exception.
*163 It is assigned for error, in the third place, that the court erred in admitting in evidence the dying declarations of Nancy Holly. This evidence was objected to first, on the ground of the constitutional provision, that the accused shah be allowed to meet the witnesses against him face to face on his trial; and secondly, on the ground of an insufficient preliminary showing that the declarations were made in articulo mortis. The constitutional objection cannot be considered an open question in Ohio at this day. It was directly decided in Montgomery v. The State, 11 Ohio Rep. 424; and in Summons v. The State, 5 Ohio St. Rep. 339, the same objection, to evidence of what a deceased witness had testified to on a former trial, was fully examined and decided. This objection is founded in a misconception of fact. The accused is confronted by the witness on his trial. The deceased person is not the witness, but the person who can relate, on the trial, the death-bed declarations, is the witness. The objection, if there be one, is to the competency of the evidence, and not to the want of the personal presence of the witness. And it appears to be well settled, that dying declarations, within the restricted rule prescribed, fall within the exceptions to the general rule that hearsay is not evidence.
It is essential to the competency of evidence of dying declarations, .that it should be made to appear to the court that they were made under a sense of impending death, excluding from the mind of the dying person all hope or expectation of recovery. In this case dissolution was rapidly approaching, and Nancy Holly died in a very short time after making the declarations admitted as evidence. We are not prepared to say, under the state of the proof, that the court erred in admitting this evidence, upon the ground that the dying person still retained a hope or expectation of recovery.
The remaining assignments of error are founded on exceptions to the charge of the court to the jury, and to the refusal to charge as requested.
*164 The court was asked to instruct the jury that, to convict under this indictment, it must be proved! that the offense was committed in Marion county; and that, if the accused gave the poison into the hands of the deceased, in Shelby county, and she did not swallow it there, but carried it with her into Marion county, and there swallowed it, and became poisoned, the crime was committed, if committed at all, in Shelby, and not in Marion county. Tbe court refused to give this instruction, as asked; but did charge tbe jury that, before finding a verdict of guilty, they must be satisfied, from tbe proof, tbat tbe accused committed tbe act in Marion county; but tbat it was not necessary tbat they should find tbat be bad been in Marion county, or bad given the poison into tbe bands of tbe deceased in tbat county; it would be sufficient to justify a conviction, if they found tbat tbe accused bad furnished tbe poison to Nancy Holly in Sbelby county, and tbat, before swallowing it, sbe bad taken it with her and went into tbe county of Marion, and there swallowed tbe poison and died. It is insisted, tbat tbe court erred in this part of tbe instructions to tbe jury. To determine this, it becomes necessary to inquire what constitutes tbe act of “ administering poison” within tbe meaning of tbe statute. If it consisted in simply giving or prescribing tbe poison* there would be great force in this exception. But tbe term” « administer,” as used in tbe statute, has acquired a legal signification, importing not simply the prescribing or giving of tbe drug, but directing and causingüto be taken. Webster, in bis dictionary (quarto), says tnaty~£i To administer medicine is to direct and cause it to be taken.” Tbe question as to tbe legal import of this term, in tbe criminal statute of England, (9 Geo. IV, 31, S. 11), was presented in tbe case of Rex v. Cadman, wherein it was held, tbat there was no administering unless tbe poison was taken into tbe stomach by tbe person to whom it was administered. Carr. Supp. 237. It is true, Ryan and Moody have given a contradictory report of this decision. Rex v. Cadman, *165 R. & M. C. C. Rep. 114. But Mr. Justice Park, who participated iu the decision, took occasion to correct the mistake and affirm the correctness of Carrington’s report of the case, in the decision of Rex v. Harley, 19 Eng. Com. Law Rep. 424, in which he said, “that his note” (as well as his recollection) “ of the case was, that the judges were unanimously of opinion that the poison had not been administered, because it had not been taken into the stomach, but only into the mouth.” That the term has the same import in the criminal statutes of this state, is manifest from the phraseology of the 37th section of the act for the punishment of crimes, (Rev. Statutes of Ohio 275,) which is as follows : “ That if any person shall give any mortal blow, or administer any poison to another, in any county within this state, with intent to kilb-and the party so stricken or poisoned thereof, shall afterwards die in any other county or state, the person giving such mortal blow,, or administering such poison, may be tried and convicted of murder or manslaughter, as the case may be, in the county where such mortal blow was given, or poison administered.” This provides for cases where, after the criminal act is fully consummated, the person receiving the mortal blow, or swallowing the poison, is enabled to go, and does go, into another county or state, before death. It is not the place of the death, but the place where the criminal act is perpetrated or consmnmated, to which the jurisdiction to try the case is given. The language of the statute is, “ and the party so stricken or poisoned thereof, shall aftex’wards die in any other county or state,” etc. The county to which the jurisdiction is given, is the county in which the pei’son is “poisoned thereof;” that is, of the administering mentioned. Now, the poison must be taken into the stomach before the person can be poisoned. So that the administering the poison is not consummated until the person to whom it is administered is poisoned. It is manifest, therefore, that the criminal act of administering poison is not consummated by simply prescribing or delivering the *166 poison; it must be actually swallowed, or taken into the stomach, pursuant to the prescription or direction given, in order to constitute the overt act of administering poison. If the accused did prescribe and deliver the poison to Nancy Holly in Shelby county, yet as she did not take it, or swallow it, in that county, the criminal act was not complete in that county, but was consummated in Marion county, where Nancy was actually poisoned. Now, where a criminal act is commenced in one county, but consummated in another, the jurisdiction to try the offender is in the county where the criminal act is consummated, or becomes complete. It is insisted, that the accused had not been in Marion county; and that a person could not commit a crime in a county in which he had not been. Ordinarily, this would be true, but it is not necessarily so. A person may commit a criminal act in a county, although he 'has never stepped a foot within its limits. If a person in Morrow county, near the line of Marion county, should, by firing a gun, or hurling a bludgeon across the county line, unlawfully kill a person in Marion county, he might be guilty of a crime, and be amenable to a prosecution in the latter county, although he had never been within its limits.
There does not appear, therefore, to have been any error in the charge of the court on this point.
It is insisted, that the common pleas erred in the following instruction, to wit: “ It is the duty of the jury to receive the law as it is given to them by the court; it is the exclusive province of the court to determine what the law is; and the jury have no right to hold the law to be otherwise in any particular than as given to them by the court.” There was no error in this instruction to the jury. By the expression, “ the jury have no right to hold the law to be otherwise in any particular,” etc., is, of course, to be understood, not the arbitrary power, but the right of the jury in the conscientious and prpper discharge of their duty. It is made *167 the peculiar province of the court to decide the questions of law, and that of the jury to decide the questions of fact, under the instructions of the court as to the law of the case. It is true, that inasmuch as the rule, that a man shall hot be put in jeopardy twice for the same offense, deprives the court of the power of granting' a new trial, in case of a verdict of acquittal, the jury has the arbitrary power, in a verdict of not guilty, to place their determination of a case, both as to law and as to fact, beyond the reach of the supervisory power of the court on motion for new trial. But this humane provision, in favor of the accused in criminal cases, was never designed to abridge the peculiar province of the court in the instructions to the jury on questions of law. Its object was wholly different. The judges of courts are selected with a view to their knowledge of the law, and jurors with a view to their practical good sense on matters of fact.' If, on the trial of a criminal case, the court err in the determination of questions of law against the accused, he has his remedy to correct the error by motion after verdict, and also by writ of error. It is the duty of the jury, therefore, to regard the law as determined by the court; and this duty is required by the obligations of the juror’s oath. And in the proper and conscientious discharge of their duty, a jury cannot, or, in other words, has no right to determine that the court has erred in its instructions as to the law, and, therefore, to disregard the law as laid down to them by the court. This is in accordance with the rule prescribed in Montgomery v. The State, 11 Ohio Rep. 424; and as settled by the great weight of authority, both in the federal and state courts. See Whar. Amer. Or. Law, from 999 to 1006, where the adjudications on this subject are collected and reviewed.
The court further charged the jury as follows, to wit: “ In most cases of murder in the first degree, it is necessary to establish, by proof, beyond a reasonable doubt, the *168 fact of killing, the intent to kill, and the deliberate and premeditated malice; but, on such an indictment as this, in order to find the defendant guilty of murder in the first degree, it is not necessary that the defendant at any time have intended to MU Nancy Holly,” etc. Tbe exception to this charge raises the question whether, under the statute of this state, a purpose or intention to -kill, enters into and constitutes an essential ingredient in the crime of murder in the first degree, committed by means of administering poison. And this is a question touching, not simply the evidence upon a trial, but the constituent elements of the crime itself. The circumstance of a person knowingly administering poison, would, in many cases, be pregnant evidence of an intention to kill. But, that poison may be administered, and even cause the death of the person taking it, when there was no purpose or intent to kill, must be conceded. Among the other supposable cases, this may occur where a physician or other person, through negligence or want of skill, shall kill another, by administering poison for some medicinal or curative purpose; or it may occur where the real purpose of administering the poison is to produce abortion with a pregnant female; or to produce some temporary sickness with a mischievous sportive view, or some temporary disability or bodily injury, but without any purpose or design whatever to kill the person to whom it is given. The determination of this question depends on the construction to be given to the first section of the statute of this state for the punishment of crimes; and it involves the inquiry, whether the punishment of death is, by our laws, inflicted for an unintentional homicide, in any case.
It is true, that purpose or intent to kill does not constitute an essential ingredient in the crime of murder by the common law. In England, there is no distinction by way of different degrees in murder; and every unlawful killing of one person by another, with malice aforethought, either express or implied, constitutes murder, and is punishable with death. This malice aforethought is said to consist, *169 “ not so properly in spite or malevolence to the deceased in particular, as any evil design in general; the dictate of a wicked, depraved and malignant heart.” 4 Wend. Bl. 198. So that, by the common law, an unlawful killing with malice afoi*ethought, even although the manifest inteut or purpose was to do simply a bodily harm, but not to take life, constituted murder.' And, formerly, in England, the punishment of murder and that of manslaughter were one and the same. 4 Wend. Bl. 201. This, however, was altered by the statutory enactments of parliament.
But, in this country, criminal homicide differs essentially from the crime in England, not only as to the definition descriptive of the essential elements which constitute the offense, but also as to the punishment, which is here proportioned to the degree of turpitude, and danger attending the act. Fouts v. The State, preceding case. Nothing reflects more credit upon the laws of this country than that enlightened and humane spirit, which, discarding the sanguinary criminal codes of Europe, has made a sensible discrimination in regard to the turpitude of crime, and not only prescribed a rational mode of punishment, but justly graduated the punishment in proportion to the enormity and danger of the offense. The shocking apparatus of death, torment and ignominy, to be met with in the criminal code of England, and of almost every other nation of Europe, has been abhorrent and disgusting to the rational sensibilities of the people of this country. Super-added to the punishment of death were circumstances of terror, pain, or disgrace, provided in England; such as being drawn or dragged to the place of execution, emboweled or burned alive, drawn and quartered, a public dissection, or the hanging of the body upon a gibbet in chains, at or near the place where the criminal act was done, etc. By the statute of 22 Hen. YIII, C. 2, the painful and lingering punishment of being boiled to death was inflicted for the crime of murder by poisoning. 4 Wend. Bl. *170 196. And the writ de hceretico comburendo, for committing to tb^amesjffiejoody of a person for the crime of heresy, is said hysoñóe to have been as ancient as the common law itself. These cruel devices for purposes of torture in inflicting the punishment of death for what was deemed the more atrocious crimes, as well as the ignominious inventions, as the punishment for minor offenses, by mutilation or dismemberment, such as the cutting off'the hand or the ears, or fixing a lasting stigma by slitting the nostrils, or branding the hand or cheek, or by the use of the pillory, the stocks, or the ducking stool, etc., have been wholly discarded in this country, as relics of barbarism, inconsistent with the humane and enlightened spirit of the age.
The leading, if not the sole object in the administration of criminal justice, is the safety and protection of the community and its several members. Criminal punishment is not inflicted as an atonement or expiation for crime; that must be left to the wisdom of an overruling Providence. And the experience of past ages has taught that crime is more effectually prevented by the certainty, than by any unreasonable severity of punishment disproportionate to the turpitude and danger of the offense. Touching this subject, Blackstone, in his Commentaries, uses the following language:
“It is absurd and impolitic to apply the same punishment to crimes of different malignity. A multitude of sanguinary laws (besides the doubt that may be entertained concerning the right of making them) do likewise prove a manifest defect, either in the wisdom of the legislative, or the strength of the executive power. It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the ultimum supplicium, to every case of difficulty.” And the same author adds: “Although we may glory in the wisdom of the English law, we shall find it more difficult to justify the frequency of capital punishment to be found *171 therein inflicted (perhaps inattentively) by a multitude of successive independent statutes upon crimes very different in their natures. It is a melancholy truth, that among the variety of actions which men are daily liable to commit, no less than a hundred and sixty have been declared to be felonies without benefit of clergy; or in other words, to be worthy of instant death. So dreadful a list, instead of diminishing, increases the number of offenders. The injured, through compassion, will often forbear to prosecute; juries, through compassion, will sometimes forget their oaths, and either acquit the guilty, or mitigate the nature of the offense; and judges, through compassion, will respite one-half of the convicts, and recommend them to the royal mercy. Among so many chances of escaping, the needy and hardened offender overlooks the multitude that suffer; he boldly engages in some desparate attempt to relieve his wants or supply his vices; and if unexpectedly the hand of justice overtakes him, he deems himself peculiarly unfortunate in falling at last a sacrifice to those laws which long impunity has taught him to contemn.” 4 "Wend. Bl. 17 and 18.
Under these circumstances and in the face of these views, expressed by the most illustrious commentator on the common law, are we to look to the sanguinary criminal code of England, thus incumbered, as it is, with vestiges of barbarous antiquity, for the purpose of ascertaining the constituent elements of criminal offenses, which are not only created, but specifically defined, or rather described, by the statutes of Ohio ? In the most, if not all, the states of this country, criminal homicide, by express statutory provision, differs, in various material and essential particulars, from what it is by the common law. In Ohio, there is no such thing as murder at common law; indeed, all criminal offenses are here created and defined by statute. And the statutory definition of criminal homicide, expressly makes purpose or intent to kill a distinguishing feature, in the crime of murder, either of the first or of the *172 second degree. And in the face of this specific provision, there can be no occasion for looking to the common law for light on the subject of the construction of this statute.
It is argued, however, that conceding this as a distinguishing element in murder of either degree, generally, yet that any homicide committed by administering poison, or while the perpetrator is in the commission or attempt to commit any rape, arson, robbery, or burglary, is, by the terms of the statute, made murder in the first degree, without this essential and distinguishing feature. This depends upon the true interpretation of the first section of the statute for the punishment of crimes. Rev. Stat. of 1854, 269.
I readily concede, that if purpose to kill is, by the express terms of the statute, made an essential ingredient in the crime of homicide by administering poison, it is equally so as to each of the other kinds of homicide, for which, by this section, the punishment of death is prescribed.
The true interpretation of the statute is best ascertained by considering, first, the reason and spirit of the law; second, the language of the section in question, in its proper and grammatical signification; third, the language employed in prior legislation on the same subject; and fourth, this provision of the statute construed in connection with other provisions relating to the same subject-matter.
1. As to the reason and spirit of the statute. The gradation of criminal punishment proportionate to the turpitude of crime, rests mainly upon the ground, that, to deter men from the commission of crimes of great atrocity, punishment of greater severity is required than for crimes of less enormity. It requires the greatest degree of depravity to harden offenders, and stimulate them to the perpetration of crimes of the highest grade; and the most wicked and depraved have less regard and fear for the milder kinds of punishment, than those who have a higher sense of humanity and moral duty. Hence the wisdom of the law has made the motive and intention of offenders an important, *173 indeed, a controlling element in discriminating between crimes of different degrees of turpitude and danger. Blackstone says: “ All the several pleas and excuses, which protect the committer of a forbidden act from the punishment which is otherwise annexed thereto, may be reduced to this single consideration — the want or defect of will. An involuntary act, as it has no claim to merit, so neither can it induce any guilt; the concurrence of the will, when it has its choice either to do or to avoid the fact in question, being the only thing that renders human actions either praiseworthy or culpable. Indeed, to make a complete crime cognizable by human laws, there must be both a will and an act.....And as a vicious will without a vicious act is no civil crime; so, on the other hand, an unwarrantable act without a vicious will is no crime at all. So that, to constitute a crime against human laws, there must he, first, a vicious will; and secondly, an unlawful act consequent upon such vicious will.” 4 Wend. Bl. 20. The same learned commentator mentions three cases in which the will does not join with the act: Eirst, where there is a defect of understanding; as in case of infancy, lunacy, etc.; second, where a man commits an unlawful act through misfortune, misadventure, or accident, and not by design; and third, where a man through ignorance or mistake, intending to do a lawful act, does that which is unlawful. In the first class of cases, there is no responsible, rational volition. In the other two, the deed and the will acting separately, or the will not cooperating with the deed, there is not that conjunction between them which is necessary to form a criminal act; in other words, “ one of the main ingredients of a crime” is wanting. 4 Wend. Bl. 26 and 27.
In the light of this important distinction, the criminal statutes of Ohio were framed. Discarding the various modes of torture, ignominy, and death, imposed by the sanguinary criminal code of England, our criminal statutes, in the enlightened spirit of reason and humanity, *174 provided imprisonment, confinement to labor, and fine and amercement, as the principal modes of punishment; one crime alone, to wit, murder in the first degree, deemed the most atrocious and as evincing the greatest depravity in the perpetrator, being made punishable by death.
Pew, if any, exceptions to the rule, that the motive, intention or willfulness of a party, in doing an act, is essential to its criminality, are to be met with in our statutes. It is true that, in favorem vitae, involuntary homicide, perpetrated in the commission of some unlawful act, is made manslaughter. And even here, although the death of the person killed is not willful or intended, yet the unlawful act must be willful, and not by mere misadventure. Murder in the second degree, by the express terms of our statute, is an intentional as well as malicious killing, although without premeditation or deliberation. Punishment by death is provided, only, for the crime of the greatest atrocity; and even for this, it has been opposed by somej as a relic of barbarism, and as unsupported by an enlightened view of human rights. It is manifest that the idea that an involuntary or unintentional homicide can, in any instance, constitute murder in the first degree, in this state, the only crime punishable by death, is repugnant to the spirit and reason of our criminal statute.
The legitimate purpose of criminal punishment being the safety of the community and its individual members, by preventing the commission of crime, it is the duty of the government to endeavor to reform rather than exterminate offenders. And experience has taught, that the objects of the criminal law are better attained by moderate but certain, than by severe and excessive penalties. Hence our law has been framed upon the idea, that the public safety necessarily required the punishment of death only in cases of the greatest depravity and atrocity. And the infliction of this extreme punishment, for a homicide neither malicious nor voluntary, is wholly irreconcilable with the enlightened reason and spirit of criminal justice, in respect to the rela *175 tive guilt of human actions, even as it is derived from the Jewish dispensation, under which cities of refuge were provided, to the end “that every one that killeth any person unawares may flee thither, and be secure from the avenger of blood.”
2. As to the language of the statute, according to its proper or grammatical signification. The section of the statute under consideration is in the following words, to wit:
“ That if any person shall purposely, and of deliberate and premeditated malice, or in the perpetration, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done; kill another; every such person shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall suffer death.”
This section is composed of one compound sentence, and is descriptive of three classes of homicide, to wit: first, that which is committed of deliberate and premeditated malice; second, that committed while in the perpetration, or attempt to perpetrate a rape, arson, robbery, or burglary; and third, that committed by administering poison, or causing the same to be done. The first clause, or distinct subdivision of the sentence, according to the punctuation, consists of the words, “ That if any person shall purposely.” And the question is, whether this preceding phrase 11 purposely,” which qualifies the word “ hill,” in the latter part of the sentence, applies to each of the three several classes of homicide mentioned in the intermediate clauses of the sentence, or whether it is limited to the first class. The word “purposely” is, by the authoritative punctuation of the statute, in a clause of the sentence distinct from that which makes “ deliberate and premeditated malice” a distinguishing feature in the first class of homicide mentioned; and it is the adverb qualifying the verb “ hill,” which constitutes the predicate of the subject of each of the several intervening clauses of the sentence. Now, it appears to be a rule of syntax that, where an antecedent adverb in the first clause qualifies a verb in the closing part of the *176 sentence, forming the predicate of the subject of several distinct intermediate clauses of the sentence, such qualification of the predicate applies to the subject of each of such intervening clauses, unless some word or words are used, expressly limiting it to a part.
It is said, that there is an ambiguity in this section of the statute, in its not being manifest, whether the word either, which is implied from the use of the disjunctive connective “ or” preceding the words, “ in the perpetration,” etc., occurs before the phrase “purposely,” in the first clause, or before the words, “ of deliberate and premeditated malice,” in the second clause of the sentence. It is very true, that the use of either of the conjunctions or, nor, etc., frequently allows an ellipsis, whereby the correlative either, or neither, is left to be understood by implication. To have expressed fully, in words, the meaning of the sentence under consideration, the word either should have been used, either before the word “purposely,” or before the words “ of deliberate and premeditated malice;” if the former, the sentence would read, “ That if any person shall, either purposely and of deliberate and premeditated malice, or in the perpetration,” etc.; if the latter, it would have read, “ That if any person shall purposely, and either of deliberate and premeditated malice, or in the perpetration,” etc. That the word either is to be understood, by implication, in one or the other of these two places, in the structure of the sentence, is undeniable. In which of the places do the rules of grammatical construction place the ellipsis? If before the word “purposely,” the structure of the sentence, at least as to punctuation, would have to be changed, and the word “ purposely ” placed in the same clause with the words, “ of deliberate and premeditated malice.” But taking this section of the statute as it is, carefully, and with manifest design, subdivided into clauses, or distinct members of the sentence, by the legislative authority, and another manifest rule of grammatical construction would seem to settle the controversy. "Where the word either as an *177 antecedent, is left to implication, by the disjunctive conjunction or, used to connect two distinct members of the sentence, the ellipsis is necessarily in the next preceding member of the sentence, which the conjunction connects, and which, in this instance, consists of the words, “ and of deliberate and premeditated malice.” Taking the language of the statute, therefore, according to its proper and grammatical signification, the word purposely, which is expressive of the intention of the party, and qualifies the verb, which is the predicate of the several clauses preceding it, not being expressly restrained or limited in its operation, applies to each of the three classes of homicide specified in the sentence. The words of the section, therefore, taken in their proper signification, and according to their grammatical construction, make a purpose to hill an essential ingredient in each of the several classes of the crime of murder in the first degree, as defined by the statute.
According to this interpretation of the language of the statute, the first kind of homicide defined, consists of an intentional hilling of deliberate and premeditated malice. But the disjunctive conjunction inserted between the clause making malice an element of the first class, and the two succeeding clauses defining the other classes of murder in the first degree, undeniably excludes the idea of malice being made essential to constitute the crime in either of them. In the second class of homicide defined, which occurs in the perpetration, or attempt to perpetrate, any rape, arson, robbery, or burglary, the enormity and turpitude of the criminal act, in which the offender is engaged at the time, supplies the place of the deliberate and premeditated malice made an element in the first class.. And in the third class defined, being homicide effected by administering poison, or causing the same to be done, the danger and atrocity of the means and manner of the killing supplies the place of the deliberate and premeditated malice made a distinguishing feature of the first class. Indeed, intentional killing, by means of administering poison, in- *178 eludes, and per se imports, malice; so that it would be mere tautology to mention malice as a distinguishing feature in the definition of it. And the atrocity of this kind of homicide precludes the necessity of the inquiry whether the malice which it imports is deliberate or not. It must be conceded, that the disjunctive connectives inserted in the clauses descriptive of the several classes of homicide defined, do exclude malice as a distinctive ingredient of the offense committed, either in the perpetration of one of the felonies mentioned, or by administering poison. If, however, purpose to kill had been dispensed with in the statutory description of these two last defined classes of murder in the first degree, malice could not have been properly omitted in the definition. Eor, inasmuch as neither the word unlawful, willful, felonious, or any other equivalent phrase, importing a wrongful or criminal quality in the act, is used in this section of the statute, if both the purpose to kill, as well as the malice, had been omitted, and dispensed with as distinctive elements of the crime, the express terms of the statute would have imposed the punishment of death for a mere involuntary homicide by misadventure, and which, in the ease of killing by administering poison, might be wholly innocent.
If a man should kill his dearest friend by administering to him, when sick, a deadly poison, under the mistaken supposition that it was a curative medicine, necessary for his restoration, such man, whether the mistake be entirely his own, or that of the druggist who prepared it, or of the physician who prescribed it, could, upon no rational idea of justice, be punished for the crime of mui’der; yet the unqualified language of our statute would require it, if a purpose to kill be not made an essential element of the crime. Suppose a quack should administer a poisonous drug, with no intent to kill or injure, but under the honest but mistaken idea of curing his patient, and that through the magnitude of the dose, or a misconception as to the quality of the drug, death ensues; this would be a clear *179 case of killing by administering poison, and would fill tbe whole statutory description of the crime ,of murder by administering poison, if a purpose to kill be not made essential; and yet this would not be a case of murder, but simply of manslaughter, even at common law. If a burglar, in passing through a house he had entered in the night season, should accidentally and unintentionally upset an article of furniture, or cause something to fall upon the cradle of a sleeping infant, and thereby kill the child, he might be subjected to the highest penalties of the statute, both for manslaughter and for burglary; but to inflict upon him the extreme punishment of death, would evince a disregard of that fundamental distinction in respect to the relative guilt of human actions, dependent on the concurrence or non-concurrence of the will with the act, as well as a disregard of that humane principle of criminal justice by which punishment is graduated in proportion to the atrocity of crime. Again, suppose a person should, from a mischievous disposition, set fire to and burn down, in the night season, some uninhabited cabin, or vacant stable, which had, in some way, become an annoyance to him, and in so doing, should unintentionally kill some benighted wanderer, who had secretly sheltered himself in such building for the night; or, suppose that some unfortunate woman, whose happiness and peace of family had been destroyed by the proximity of a distillery, which had become the ruinous haunt of her husband, or her sons, should, in the night season, when no human being was supposed to be in the building, set fire to it, and, by so doing, unintentionally kill a sleeping inebriate, who, having become quiescent, had, unobserved, been shut up in the house for the night; in neither case, could the extreme punishment prescribed for the crime of the greatest atrocity, be inflicted consistently with the reason and true intent of our statute; yet it would be unavoidable, if the statute be so interpreted as to dispense with purpose to hill as an element of the crime in any case of murder in the first degree.
*180 Light may be thrown upon the interpretation of our statute by the statutes and adjudications in some of the other states, although they have deviated less from the common law as to the distinctive elements in the crime of murder. The statute of Pennsylvania, on the subject of murder, is in the following language, to wit:
“ All murder which shall be perpetrated by means of poison, or lying in wait, or by any other kind of willful, deliberate and premeditated Jailing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder in the first degree ; and all other kinds of murder shall be deemed murder of the second degree.” The punishment prescribed by this statute for murder in the first degree, is death; and that for murder in the second degree, is imprisonment.
The statutes of Virginia, Connecticut, Tennessee, and a number of the other states, do not differ substantially, or very materially, from that of Pennsylvania, above recited.
It may be remarked, that it has been uniformly adjudged, that the term murder, as used in these statutes, is to be taken in its technical meaning at common law. And the clause providing that, “ all other kinds of murder shall be deemed murder in the second degree,” has been interpreted to mean all murder by the common law, not comprehended in the preceding descriptive definition of murder in the first degree. Let the difference between the phraseology of the statute of Pennsylvania and that of Ohio, be also observed and borne in mind. The language of the former is: “ All murder, which shall be perpetrated by means of poison,” etc., “ or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, shall,” etc. The term murder is here used in its legal signification, importing homicide with malice aforethought, either express or implied. So that, the homicide by means of poison, here mentioned, is a killing with malice aforethought. And so, also, in regard to the homicide committed in the perpetration of either of the felonies mentioned; that is, “ all murder, or, in other *181 words, all homicide with malice aforethought, committed in the perpetration, or attempt to perpetrate, any arson,” etc., shall be murder in the first degree. Essentially different is the phraseology of the statute of Ohio. The technical phrase murder is not introduced or used here, in defining or describing the different classes and degrees of the crime. The language is: 11 If any person shall purposely,” (in the manner specified in the three several classes mentioned in the first section,) “ kill another, every such person shall be deemed guilty,” etc. Now, the legal phrase murder not being used in our statute, in the description of the elements of the crime, the simple killing while in the perpetration or attempt to perpetrate one of the felonies mentioned, or by administering poison, would not import a malicious killing, or have any feature whatever to distinguish it from an involuntary homicide, or killing by misadventure, unless, the purpose to kill applies, enters into, and constitutes an element of it.
In a recent decision of the supreme court of Pennsylvania, it was held, that a premeditated intention to destroy life is indispensable in order to constitute murder in the first degree, under the statute of that state. Johnson v. The Commonwealth, 24 Penn. St. Rep. 387. Now, the term murder, used in the Pennsylvania statute, although it imports a homicide with malice aforethought, does not, per se, import an intentional killing. And if premeditated intention to destroy life is essential to murder in the first degree, under the Pennsylvania statute, with what reason could it be dispensed with in any reasonable interpretation of the statute of Ohio ?
It appears that, in the case of Commonwealth v. Keeper of Prison, 2 Ashm. Rep. 22, where a poisonous drug was administered to a pregnant woman with intent to cause the death of the child of which she was pregnant, and the woman died in consequence, it was held murder in the second degree, under the statute of that state. While this would be clearly reconcilable to the Pennsylvania *182 statute, there can be no murder in the second degree, under our statute, without an intention or purpose to kill.
It was adjudged by the supreme court of Tennessee, under a statute not differing substantially from that of Pennsylvania, above recited, that “the characteristic quality of murder in the first degree, and that which distinguishes it from murder in the second degree, is the existence of a settled purpose and fixed design on the part of the assailant, that the act of assault should result in the death of the party assailed; that death being the end aimed at, the object sought for, and wished.” Swan v. The State, 4 Humph. Rep. 136, 139. Also, in Dale v. The State, 10 Yerg. Rep. 551, it was said, that to constitute murder in the first degree, the killing must be willful, that is, of purpose, with the intent that the act by which the life of a party is taken, should have that effect. Again, in Commonwealth v. Jones, 1 Leigh Rep. 611, it was held by the court of appeals, in Virginia, that, to convict of murder in the first degree, proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused, sought.
It is said, that the result of this interpretation would be to exempt from capital punishment, the offender who kills a person by firing a gun into a promiscuous crowd; as well as the party, who, deliberately and maliciously intending to kill one person, accidentally and unintentionally kills another. The questions, in these instances, are not necessarily involved in this case; and it will be time enough to decide how far they may be affected by the time interpretation of the statute, when they shall directly arise. But, as a matter of argument, they may have a j>assing notice. As to the first instance, the question cannot be affected by the principle of this decision. When the killing is the result of firing a gun into a promiscuous crowd, the purpose or intent is a matter of proof; as a rule of evidence, a party may be presumed to intend the *183 natural consequence of his own act; and if, in shooting into a crowd, he deliberately and maliciously intend to kill any person he may happen to hit, without having any particular person in view, his intention to kill being general, and directed against each person in the crowd, he may be fairly taken to have actually compassed the death of the person he has killed. This, however, is a matter arising upon the evidence, and the principle of this decision touches simply the essential ingredients constituting the crime, and not the legal presumptions or rules of evidence arising upon the proof.
As to the question involved in the other instance mentioned, it may be remarked, that we must look to the statute of this state, and not to the common law of England, in order to ascertain the essential elements of the several kinds of criminal homicide in Ohio. It is a rule of the common law, it is true, that whex-e the offender attempts, with malice aforethought, to kill one person, and failing in that, accidentally and xxnintentionally kills another, he is guilty of murder, and liable to the penalty for that crime. This follows as a logical result from the law of homicide in England, 'where thex’e is but one degree of crime in murder, and intention to kill is not essential to constitute the offense, and the malice aforethought constituting the distinguishing element of the crime, does not necessarily consist in ill will towards the particular person injured, but a genex'al depravity of disposition, or heart, regardless of social duty, and fatally bent on mischief. But we are not to lose sight of the distinction between statutoxy murder in Ohio, and murder at common law in England. The specific provisions of the statute have created the distinction as to the essential elements of the crime here.
It is said, that the punishment for manslaughter would not be sufficiently severe for an involuntary homicide, committed in the perpetration of either of the felonies mentioned. Superadded to the punishment, to the utxnost extent of the law for manslaughter, the offender would be *184 liable to the utmost penalty for the perpetration or attempt to perpetrate the felony in which he was engaged at the time. A man may commit more than a single crime in one transaction, where the offenses are distinguishable from each other; and, in such instance, a conviction for one will not bar proceedings against him for the other. State v. Fife, 1 Bail. Rep. 1; State v. Dawson, 2 Tyler Rep. 887; Bish. Cr. Law, sec. 530, 531.
The question, whether the rule of the common law, that where a person attempting maliciously and intentionally to kill one person, accidentally and unintentionally kills another, it is murder, has any application to homicide under the statutory description of it in this country, appears to have been fully investigated, and directly determined by the supreme court of Tennessee, on mature deliberation, in the case of Bratton v. The State, 10 Humph. Rep. 103. In this case, the court, in an able opinion, by Mr. Justice McKinney, said:
“ If the universal principle of construction is to be regarded, that every word, in a statute is to have meaning and effect given to it, if practicable, it results of necessity, by force of the terms employed in the definition of the crime, that to constitute murder in the first degree, it must be established that there existed in the mind of the agent, at the time of the act, a specified intention to take the life of the particular person slain......If, then, by misadventure or other cause, a blow, directed at a particular person, and designed to take his life, take effect upon, and cause the death of a third person, against whom no injury was meditated, can it be said, that the will concurred with the act, which resulted in the accidental death of such third person; or that there existed a specific intention to take his life ? A grosser absurdity cannot be conceived. The hypothesis that the killing was undesigned, concedes that the will did not concur with the act; that in point of fact no such specific intention existed, no such result was contemplated or designed. And upon what principle is it that this would be murder at common law ? Simply upon the principle of implied or imputed malice or intention. In such case, all the essential elements of murder at common law occur.....But we have seen that murder in the first degree, as constituted by our statute, depends upon the existence of a specific intention to take the life of a person slain, and that the existence of such an intention, as a matter of fact, must be satisfactorily established. Hence it is clear to a demonstration, that all legal implication or imputation of such an intention, is excluded in reference to this particular species of murder.”
3. This interpretation derives strength from the language *185 of prior legislation on the same subject. Our first legislation on the subject was under the territorial organization, in 1788, in which the common law description of criminal homicide was strictly followed,-and no distinction made "by way of different degrees in murder. And the same provision, substantially, was re-enacted in 1804, after the organization of the state government. In 1815; the common law description of murder was repealed, and the crime specifically defined, and divided into two degrees. 2 Chase’s Ohio Stat. 857. In this statute, the descriptions of murder in the second degree and manslaughter do not differ substantially from that of our present statute; but the definition of murder in the first degree was in the following language: “ If any person shall purposely, of deliberate and premeditated malice, or in the perpetration or attempt to perpetrate any rape, arson, robbery, or burglary, kill another, every such person, his or her aiders, abettors, counsellors and procurers shall be deemed guilty of murder in the first degree, and upon conviction thereof shall suffer death.” This was re-enacted in 1821, and again in 1824, and again in 1881; and in 1835 it was repealed, and the statute now in force passed. The change in the description of murder in the first degree, made by the enactment of 1835, on that of 1831, was merely verbal, designed to make the definition more specific, and did not alter the substantial ingredients constituting the offense. Dnder the statute of 1815, and as it existed until 1835, murder in the first degree, by means of poison, was manifestly included in the first class of the offense mentioned, consisting in killing purposely and of deliberate and premeditated malice. But, inasmuch as a killing purposely, by means of administering poison, did, within and of itself, import and include deliberate and premeditated malice, it was deemed proper to separate that class of homicide in the definition, making it to consist in killing purposely by the administration of poison, and thus relieve the state, in a prosecution for the offense, from the necessity or *186 trouble of any proof on the subject of the malice. The only other change made by the statute of 1835, in the description of this olfense, was the addition of the word “ and ” at the commencement of the second clause of the section. This was doubtless inserted for the sake of perspicuity, as the additional clause relating to homicide by poison' made the sentence more complex. And it is observable, that not only in the enactment of 1815, but also in every succeeding enactment, the word “purposely ” is to be found in a separate clause of the sentence distinct from that which distinguishes homicide of deliberate and premeditated malice from the other kinds mentioned. And in the act of 1835, by connecting the clause containing the word “purposely” with the second clause, by the word “ and,” and with each of the succeeding clauses descriptive of the crime, by the connective “ or,” the qualification of the word “ kill,” in its application to the subject of each of these several clauses, is made even more perspicuous than it was in the prior enactments. And inasmuch as murder in the first degree, by the administration of poison, was included in the first class of homicide defined in the former statute, which required both purpose and deliberate and premeditated malice as ingredients, it would be absurd to suppose that the statute of 1835 had made homicide, by administering poison, murder in the first degree, without either a purpose to kill or malice. Eor, although homicide by administering poison, with a purpose to kill, does per se import malice, yet homicide without such purpose, does not necessarily import malice, and may be wholly devoid of the turpitude of crime.
4. This interpretation is amply confirmed by considering the section under consideration, in its connection with other provisions of our criminal statutes.
It is said, that a statute is often its own best expositor ; and that, in giving a construction to a statute, the whole act and all its parts are to be considered, as well as all other statutes in pari materia. And if any section be in *187 trícate, obscure, or doubtful, the proper mode of discovering its true meaning is to compare it with other sections, and finding out the sense of one clause by the words and obvious intent of another. Smith’s Stat. Constr. 649. This, observes Coke, is the most natural and genuine method of expounding a statute (Co. Litt. 381); it is, therefore a true principle, that an antecedent provision of a statute, of which the meaning is doubtful, may be explained by reference to a subsequent section.
Now the second section of this statute, being the next following that under consideration, defines murder in the second degree, and, in language explicit and unequivocal, makes both intention to kill, and malice, essential to constitute murder in the second degree, in any ease. It would, therefore, lead to a gross absurdity, to interpret the language of the first section as making an unintentional homicide, and that, too, of which deliberate and premeditated malice was not an ingredient, constitute murder in the first degree, for which the punishment of death was prescribed.
The third section of the statute, in language equally explicit, and not admitting of an exception, makes an unlawful killing, without malice and unintentionally, while the slayer is in the 'commission of some unlawful act, the crime of manslaughter. Now, I inquire, how an unintentional killing, without malice, while the slayer is engaged in the perpetration, or attempt to perpetrate a rape, arson, robbery or burglary, is to be distinguished from this description of manslaughter? It cannot be pretended, that malice is made an essential ingredient in this second class of murder in the first degree, defined in the first section of the statute; so that, if purpose or intent to hill be not an essential ingredient, it falls strictly and clearly within the definition of one class of manslaughter. The same may be said of homicide by administering poison, as defined in the first section. Malice is not made essential in order to constitute the crime; so that, if purpose or intent to kill may be dispensed with, how will an unintentional killing by admin *188 istering poison, through, gross carelessness, or with an intent simply to do some personal injury, be distinguished from the express statutory description of manslaughter ? If purpose to hill be not an essential ingredient in these two last mentioned classes of murder in the first degree, under the first section, the section defining manslaughter is grossly deficient in not having the words, “ except in the cases provided for in the first section of this act,” added to the description of manslaughter above mentioned; and consequently, our statutory description of the several kinds of criminal homicide, contains the monstrous blunder of having confounded in undistinguishable confusion two classes of murder in the first degree, with an extensive class of manslaughter. But the correct interpretation of the first section of the statute avoids all this confusion and absurdity, and is consistent with the humane spirit and reasonable intent of the statute.
Besides the provisions for the punishment of crimes actually perpetrated, the statute has also provided for the punishment of the attempt to perpetrate many of the high crimes; such as the assault with intent to commit a murder, rape, or robbery; and shooting at, stabbing, etc., with intent to kill, or maim, etc. And corresponding with the provision for the punishment of the crime of homicide by administering poison, is the provision of the thirty-fourth section of the act for the attempt to commit the crime, the descriptive part of which is as follows: “ If any person-shall administer poison to another, with intent to destroy or take the life of the person to whom the same shall be administei’ed, or to do him an injury; or if poison shall be prepared with the intent aforesaid, and the same shall be taken by any person, whereby an injury to such person may be done,” etc. The offense here provided for is the attempt to perpetrate an act which, had it been consummated and resulted in the death of the person against whom it was attempted, would have been either murder or manslaughter. Had it been with the intent to hill, the consummation *189 of the act would have been murder in the first degree; but had the intent: been, not to kill, but to do simply a bodily injury, and the act had resulted in the death of the party injured, the offense would "have constituted manslaughter under our statute. But why is the intent wTith which the attempt is made, by the express terms of the statute, constituted an essential ingredient in this offense ? If the purpose or intent with which the poison is administered be not an essential element in the crime of murder by administering poison, why make the intent an essential part of the crime of attempting its perpetration ?
Again, that intent to lull constitutes an element in. the crime of murder by administering poison, is apparent from the express language of the thirty-seventh section of the same statute, which prescribes the county in which the accused shall be tried, in case the poison be administered in one county, and the person so poisoned die in another county or state. The language of this section is: “ If any person shall give any mortal blow, or administer any poison to another, in any county within this state, with intent to kill, and the party so stricken or poisoned thereof shall afterward die in any other county or state,” etc. If unintentional killing by administering poison constituted murder in the first degree, can any sensible reason be assigned for its omission, in this necessary and important provision, as to the place of the trial ? And if intent to kill be not an ingredient in the crime of killing by poison, why couple it, in express terms, with that crime, in this provision ?
Finally, if purpose to kill be not essential to the crime of murder in the first degree by administering poison, any homicide, caused by administering poison to a pregnant woman to produce abortion, would most clearly fall within the statutory description of capital offenses, and subject the offender to the punishment of death. The necessary consequence of such an interpretation of the statute, for the punishment of murder in the first degree, which was enacted in 1835, would be the repeal of the section of the *190 statute providing imprisonment in the penitentiary for the offense of causing the death of a woman pregnant with a quick child, by administering poison, with intent thereby to produce an abortion, and destroy such unborn child. Eor the last mentioned enactment, which was passed in 1834, would be wholly inconsistent with the subsequent act, passed in 1835, making the same offense murder in the first degree, and subjecting the offender to the punishment of death.
It appears, therefore, from a full and careful examina-, tion of the subject in all its bearings, that, by the true meaning and legal intent-of the first section of ofiRstatute relating to criminal homicide, furyose to MI, in made an eásenSal ingredient in murder in the first degree bv admfmsfiermgpm And this is the conclusion of a majority of the court, on the most mature consideration. The court of common pleas, therefore, erred in the charge to the jury in this respect.
The court further instructed the jury that, if the accused administered the poison to Nancy Holly of which she died, with a knowledge of its poisonous or deadly quality, and with intent not to kill her, but to produce an abortion, or destroy a child of which she was pregnant at the time, this would be sufficient to constitute murder in the first degree. "We are unanimous in the opinion that there was error in this charge.
The offense of killing a woman pregnant of a quick child, by administering to her. medicine, with intent to produce abortion and thereby destroy the unborn child, is specially provided for by the statute relating to that subject, passed in 1834. It is true, the killing a person unintentionally and without malice, while the slayer is engaged in any unlawful act, is, by the statute for the punishment of crimes, enacted in 1835, made manslaughter; and it is difficult, if not impossible, to distinguish the offense, pro *191 vided for by the statute of 1884, from that defined in the statute of 1835, by any of the ingredients essential to the crime. The offense will answer the descriptive definition of .either statute, and the only actual distinction made is in the penalty, which, under the act of 1834, is imprisonment in the penitentiary from one to seven years, and that, under the act of 1835, from one to ten years. As to the elements of the crime, and also the punishment as far as the imprisonment of from one to seven years goes, the two statutes, as to this offense, are identical; the only discrepancy consisting in the discretion given by the last statute, to make the imprisonment three years longer than that authorized by the first. The act of 1835 contains no express repeal of the act of 1834. And as repeals by implication are not favored, a subsequent affirmative statute do.es not repeal a prior statute unless there be conflict between the two, which is direct and irreconcilable upon any recognized rule of statutory construction. Wood v. United States, 16 Pet. Rep. 342, 362; Rex v. Paine, 1 East P. C. 5; Bish. Cr. Law, sec. 92. There are instances where statutes, enacted at different times, and not conflicting in any essential matter, are allowed to stand as concurrent provisions. But it appears to be well settled, that a statute, general in its terms and without negative words, will not he construed to repeal, by implication, the particular provisions of a former one, which are special in their application to a particular case, or class of cases, unless the repugnancy be so glaring and irreconcilable as to indicate the legislative intention to repeal. Dwarr. on Stat. 532; 6 Rep. 196; Sedg. on Stat. Constr. 123. The author last cited, says: “ The reason and philosophy of the rule are, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute, in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, *192 unless it is absolutely necessary to give tbe latter act such a construction, in order that its words shall have any meaning at all.” So it is said, that inasmuch as two acts seemingly repugnant must, if possible, be so construed that the latter may not operate as a repeal of the former by implication, a subsequent statute which is general, does not abrogate a former statute which is particular and special in its application. 12 Ill. Rep. 341.
The statute of 1834, in question, makes the unlawful act the gist of the offense, and the consequential death simply a descriptive circumstance; while the act of 1835 makes the killing the gist of the crime, and the unlawful means and object simply distinctive matters of description. This, however, does not seem to create any actual distinction between the two statutes, as to the essential elements of the crime. And the question, whether evidence proving that the accused had administered a poisonous drug to a woman pregnant with a quick child, with intent to produce thereby an abortion, of which the woman died, would support an indictment, under the statute, for manslaughter, is a question not necessarily involved in this case, and one upon which we deem it proper to express no opinion at this time. But we are clear in our conclusion, that the statutory provision relating to manslaughter, enacted in 1835, did not repeal the above mentioned statute of 1834.
It was not charged in the indictment, in this case, that the crime consisted in killing the child of which Nancy Holly was pregnant. And had it been so chai’ged, it could not have amounted to the crime of murder; for, under our statute, neither degree of criminal homicide can be predicated upon the killing of an unborn child.
And again, after stating as a rule of law, that to constitute murder in the first degree, by means of administering poison, it was not essential to prove an intent to take life; and also, after stating the facts requisite, under such holding, in order to justify a conviction for murder in the *193 'first degree, the court further charged the jury as follows: “If these facts are proven, the defendant is guilty of murder in the first degree, and the jury cannot find him guilty of any less crime.” And in the conclusion of the charge, the court added: “If you find the defendant not guilty, you will simply so say in your verdict. If you find him guilty, the statute expressly requires you to specify in your verdict of what crime he is guilty. If, therefore, you find the defendant guilty as he stands charged in the indictment, you will in your verdict say, ‘ We, the jury, find the defendant, Edward Bobbins, guilty of murder in the first degree, as he stands charged in the indictmentIt will not he sufficient to say only, that you find him guilty, or that you find him guilty of murder; for, in certain cases, murder may be of different degrees.”
Now, this indictment contained several counts charging the accused with killing Nancy Holly by means of poison, without the averment of a purpose or intent to kill, which would have been good as counts for manslaughter. • And it may be remarked that an indictment for murder in the first degree necessarily includes what constitutes the lower degrees of criminal homicide, upon the principle that the whole necessarily comprehends its various parts. So that either a verdict of guilty of murder in the second degree, in manner and form as charged in the indictment, or a verdict of guilty of manslaughter, in manner and form as charged in the indictment, would have been in due form and sufficient, and might have been lawfully sustained as a good verdict under this indictment. A verdict for either murder in the second degree or manslaughter, is always good and may .be sustained under an indictment for murder in the first degreé; and the addition of the words in the verdict, “ as the defendant stands charged in the indictment,” do not amount to any thing at all, inasmuch’ as they would be as applicable to one as to another of the different degrees of criminal homicide for which a verdict may be rendered under the indictment. Dick v. *194 The State, 3 Ohio St. Rep. 89. It is, therefore, specially provided in the statute for the punishment of crimes, uthat in all trials for murder, the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter; and if such person be convicted by confession in open court, the court shall proceed by examination of witnesses, in open court, to determine the degree of the crime,” etc. Now, the reason for requiring the jury to ascertain, in their verdict, the degree of the homicide is, that a verdict of “guilty as the defendant stands charged in the indictment,” does not ascertain the degree of the crime. The jury cannot render a verdict otherwise than as the defendant stands charged in the indictment. Rut on an indictment for murder in the first degree, a verdict that the defendant is guilty of either of the degrees of criminal homicide, as he stands charged in the indictment, would be good and sufficient. The jury is not expected to analyze the indictment, and determine which degree of the crime is technically charged therein. That is a matter for the determination of the court, in submitting the cause to the jury, and especially when rendering the judgment in the case on a verdict against the accused.
Now, in this case, the court charged the jury, that if they found the defendant guilty as he stands charged in the indictment, they must say that he is guilty of murder in the first degree, because, “ in certain cases murder may be of different degrees.” This, as a legal proposition, was erroneous. In all cases of criminal homicide, the crime is graduated, and may be one or the other of the three degrees; and if the jury find the accused guilty as he stands charged in the indictment, they must determine or ascertain, from the evidence before them, of which of the three degrees of the crime the defendant is guilty as he stands charged in the indictment. Rut the legal proposition laid down by the court to the jury left them no discretion whatever. They could not find the defendant guilty *195 otherwise than as he stood charged in the indictment; and the court instructed them that if they found him guilty as he stood charged, they were bound to find him guilty of murder in the first degree; for the reason that in certain cases murder may be of different degrees. This was saying to the jury, in effect, that in this case, being a case of homicide by means of poison, the crime was not graduated, but must necessarily rise to the grade of murder in the first degree. This was, therefore, ascertaining the degree of the offense by a legal proposition determined by the court, instead of leaving it to the jury to ascertain the degree of the offense from the evidence given on the trial. Murder by means of poison, cannot be made an exception. The language of the statute is, “ that in all trials for murder,” the jury shall ascertain the degree of the crime. It is- undeniable that manslaughter may be committed by means of poison. And in the case of State v. Dowd, 69 Conn. Rep. 391, the supreme court of Connecticut, on full consideration, sustained a verdict for murder in the second degree, on an indictment for murder in the first degree by means of poison. If' this could be done under the peculiar phraseology of the statute of Connecticut, which is identical with that of Pennsylvania, above recited, there certainly could not be a question as to its regularity under the statute of Ohio.
The judgment of the court of common pleas is reversed, and the cause remanded for further proceedings.
Scott and Sutlikf, JJ., concurred.